# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
No. 19-1494V
Filed: November 16, 2021
PUBLISHED

| | |
|---|---|
| HANNAH YORGY,<br><br>                 Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>                 Respondent. | Special Master Horner<br><br>Attorneys' Fees and Costs; Denial;<br>Reasonable Basis; Influenza (Flu)<br>Vaccine |

*Matthew L. Owens*, Harrisburg, PA, for petitioner.
*Voris E. Johnson, Jr.*, U.S. Department of Justice, Washington, DC, for respondent.

## DECISION REGARDING ATTORNEYS' FEES AND COSTS[1]

On September 27, 2019, petitioner, Hannah Yorgy[2], filed a petition under the National Childhood Vaccine Act, 42 U.S.C. § 300aa-10-34 (2012)[3] alleging that she suffered reading comprehension deficits, headaches, involuntary eye darting and twitching, insomnia, dizziness, fatigue, nausea, Tourette's syndrome, numbness in legs, tingling and tremors in hands and legs, Postural Orthostatic Tachycardia Syndrome, mouth twitching, personality changes, sensory issues and abdominal pain as the result of an influenza ("flu") vaccination administered on September 22, 2016.  (ECF No. 1, p.

---

[1] Because this decision contains a reasoned explanation for the special master's action in this case, it will be posted on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002.  *See* 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services).  **This means the decision will be available to anyone with access to the Internet.**  In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information the disclosure of which would constitute an unwarranted invasion of privacy.  If the special master, upon review, agrees that the identified material fits within this definition, it will be redacted from public access.

[2] Petitioner was a minor when the petition was filed, so her parents filed the petition as her legal representatives.  Petitioner reached the age of majority and was substituted as petitioner on July 17, 2020.  (ECF No. 38.)

[3] Hereinafter, all references to "§300aa" refer to sections of the Vaccine Act.

1.)  On January 11, 2021 petitioner filed a Joint Stipulation of Dismissal.  (ECF No. 46.)  Petitioner now moves for an award of attorneys' fees and costs.  (ECF No. 49.).  Respondent opposes petitioner's motion for attorneys' fees and costs, arguing that petitioner lacked a reasonable basis in bringing her petition.  (ECF No. 50.)  For the reasons described below, I find that petitioner is not entitled to an award of attorneys' fees and costs.

## I.  Procedural History

On September 27, 2019 petitioner's parents filed a petition on her behalf accompanied by medical records.[4]  (ECF No. 1.)  The case was initially assigned to Chief Special Master Brian Corcoran.  (Dkt. Oct. 1, 2019.)  On February 20, 2020 petitioner filed additional medical records and a statement of completion.  (ECF Nos. 12-19.)  This case was reassigned to me on April 20, 2020.  (ECF No. 27.)  On May 7, 2020 petitioner filed her school attendance and accommodations records.  (ECF No. 31.)  Petitioner filed additional medical records on May 14, 2020.  (ECF No. 33.)  I held a status conference on July 13, 2020 to discuss petitioner's outstanding medical records.  (ECF No. 37.)

Petitioner reached the age of majority and was substituted as petitioner on July 17, 2020.  (ECF No. 38.)  On October 8, 2020 petitioner filed additional records.  (ECF No. 41.)  On November 9, 2020 respondent filed his Rule 4(c) report, arguing that the evidence presented did not meet petitioner's burden of proof and recommending against compensation.  (ECF No. 43.)  On November 18, 2020 petitioner filed her remaining medical records.  (ECF No. 45.)  Petitioner then filed a joint stipulation of dismissal on January 11, 2021.  (ECF No. 46.)  An Order Concluding Proceedings was entered the same day.  (ECF No. 47.)  Petitioner filed an application for attorneys' fees and costs seeking $14,411.18 on June 10, 2021.[5]  (ECF No. 49.)  Respondent filed a response on June 24, 2021.  (ECF No. 50.)  Petitioner filed a reply on June 30, 2021.  (ECF No. 51.)

## II.  Factual History

On January 10, 2002, petitioner was born in Blair County, Pennsylvania.  (Ex. 11-1 at 15.)  On July 24, 2008, at six years and six months, petitioner was seen for abdominal pain lasting two to three months, complaining that her "tummy hurts 85% of [the] time."  (Ex. 1 at 37.)

---

[4] Petitioner initially filed her medical records as Exhibits A through N.  (ECF No. 1.)  Subsequently, petitioner's exhibits are labeled numerically as Exhibits 1 through 22.  (ECF Nos. 12-15, 31, 33, 41, 45.)

[5] Attached to her motion for attorneys' fees and costs, petitioner filed Exhibits A through E.  (ECF No. 49.)  To avoid confusion with petitioner's earlier filed Exhibits (*See* ECF No. 1), any reference to alphabetical exhibits in this decision shall refer to the exhibits attached to petitioner's petition filed on September 27, 2019.  (ECF No. 1.)

On September 13, 2011, at nine years and eight months, petitioner presented to her pediatrician, Allison Wawer-Chubb, D.O., complaining of visual problems for the past two weeks, "and becoming more frequent." (Ex. 11-2, p. 45.) Dr. Wawer-Chubb assessed that petitioner was experiencing a "visual field defect." (*Id.*) On September 20, 2011, petitioner went to the Penn State Hershey Medical Center (hereinafter: "PSHMC") emergency department for visual disturbances occasionally associated with headache. (Ex. 6-1, p. 19.) An MRI of petitioner's brain and an MRA of petitioner's head and neck showed normal findings, as did an EEG petitioner received on September 27, 2011 for visual distortions. (*Id.* at 67-68; Ex. 3-1, p. 106.)

On October 6, 2011, petitioner saw pediatric neuro-ophthalmologist Grant Liu, M.D., at the Children's Hospital of Philadelphia (hereinafter: "CHOP") for visual distortions consisting of bilateral flashes at "any time of day, morning, night and afternoon." (Ex. 9, pp. 2-3.) Dr. Liu noted that "[t]here were only 2 times when [petitioner] had an associated headache." (*Id.*) Petitioner's exam was normal, and Dr. Liu thought the visual distortions were likely benign. (*Id.*) Dr. Liu stated that further testing was not necessary, and he was "reluctant to make a diagnosis of migraine without a history of headaches." (*Id.* at 3.)

On March 14, 2012, petitioner saw Kendra Sirolly, M.D., for abdominal pain. (Ex. 11-2, p. 37.) Petitioner's physical exam showed mild periumbilical pain as well as a "mobile mass consistent with stool" in the lower left quadrant of the abdomen but was otherwise normal. (*Id.*)

On December 20, 2012 and on January 7, 2013, petitioner began behavioral therapy counseling at Wellspan Health for issues with anger and frustration felt towards her three younger siblings. (Ex. 4, pp. 4-6.) At this point, petitioner's "academic performance [and] behavior at school [wa]s excellent," and petitioner had "healthy social peer relationships [and] participation in class." (*Id.* at 4.)

Petitioner presented to Guy Moscato, M.D., on August 26, 2013 for abdominal pain for the past four to five weeks, with the pain growing worse with meals, and for a frontal headache for the past five weeks. (Ex. 11-2, pp. 18-19.) Dr. Moscato instructed petitioner to increase her fiber, fruits and vegetables. (*Id.*)

On March 5, 2014, petitioner saw Katie Kandrysawtz, CRNP, complaining of recurrent, intermittent headaches for "over a year" that seemed to be getting more frequent. (Ex. 11-2, p. 7.) Petitioner's headaches interfered "with her daily activities," with petitioner going to the nurse twice a day for an ice pack and with ibuprofen no longer helping. (*Id.*) Petitioner was waking up and going to bed with the headaches, had had a headache for three days straight, and experienced worse headaches while reading. (*Id.*) Petitioner's "visual disturbances stopped" and the CRNP concluded that petitioner was experiencing "atypical migraine possibly or hormonal." (*Id.*)

Petitioner saw Matthew Hendell, MSN, CNRN, CRNP, for a neurological evaluation for her headaches on March 24, 2014, after a headache "event that lasted

3

almost six days." (Ex. 2, pp. 43-44.) Petitioner reported headaches two times per week, "for many months." (*Id.* at 44.) CRNP Hendell similarly suspected undifferentiated migraine. (*Id.* at 43.) At a follow-up with NP Hendell on May 12, 2014, petitioner's general and neurological exams were normal. (*Id.* at 25.) Petitioner's mother expressed concern over an "underlying structural explanation" for petitioner's headaches. (*Id.*) NP Hendell remarked that this was "highly unlikely[,]" though he agreed to proceed with an MRI. (*Id.*) He also discussed a prescription for amitriptyline. (*Id.*) An MRI taken on May 22, 2014 was unremarkable. (Ex. 3-1, p. 86.)

On July 31, 2014, petitioner received an x-ray of her abdomen for abdominal pain, but the x-ray showed no acute findings. (Ex. 3-1, p. 90.)

On September 22, 2015, petitioner saw Douglas Field, M.D., at the PSHMC pediatric gastroenterology nutrition office for a one-year history of abdominal pain. (Ex. 6-1, pp. 75-76.) Petitioner's abdominal pain was "achy in nature, occurring 2-3 times per week," would last for five to fifteen minutes or occasionally longer, and was aggravated by eating. (*Id.* at 75.) Petitioner's family history was significant for irritable bowel syndrome ("IBS") in her mother, and Dr. Field wrote that possible causes of petitioner's abdominal pain included IBS, celiac disease, lactose intolerance, peptic ulcer disease and gastroesophageal reflux. (*Id.* at 75-76.) He wrote that "she could also have although less likely pancreatitis, hepatitis, gallstones or inflammatory bowel disease." (*Id.* at 76.) Dr. Field recommended petitioner "continue with a high fiber diet," take probiotics, and undergo follow-up testing. *Id.*

Petitioner received the flu vaccine at issue on September 22, 2016. (ECF No. 1, Ex. A, p. 4.)

On September 27, 2016, petitioner followed up with CRNP Laurie Yuncker-Stumpf at the PSHMC pediatric gastroenterology nutrition clinic for her abdominal pain. (Ex. 6-1, pp. 101-02, 132.) Petitioner had last been evaluated by Dr. Field in September 2015 and had not undergone the previously recommended testing. (*Id.* at 101-02.) Petitioner was still having abdominal pain one to four times a week for "well over two years now." (*Id.*) NP Yuncker-Stumpf recommended petitioner test for gastritis, IBS, and celiac disease. (*Id.*)

On October 3, 2016, petitioner saw her primary care physician, Lori Abels, D.O., at Springdale Pediatric Medicine, for vision changes, headaches, eyes darting back and forth, and bilateral eye twitching, as well as depth perception issues and dimensional and visual outline problems,[6] with at least one of these symptoms occurring "3-4 times a day."[7] (ECF No. 1, Ex. B, p. 2-4.) Dr. Abels noted that petitioner's symptoms "started a while ago", approximately "middle of the summer," and were sporadic, occurring "maybe

---

[6] Petitioner's "vision is 'hazy,' there is a 'distinct outline,' or things look distorted – can last a few hours or more." (ECF No. 1, Ex. B, p. 2.)

[7] It is unclear from Dr. Abels' notes which symptom(s) "occurs 3-4 times a day." (ECF No. 1, Ex. B, p. 2.)

3-4 times this past summer." (*Id.* at 2.)  Though petitioner also stated that her symptoms had become more frequent, occurring multiple times daily over the prior week.  (*Id.*)  After reviewing petitioner's recent lab results, Dr. Abels mentioned that the normal inflammatory markers and complete blood count were reassuring.  (*Id.*)  Dr. Abels referred petitioner to a neurologist.  (*Id.*)  On October 6, 2016, petitioner underwent an EEG which showed no epileptiform abnormalities, but the neurologist noted that petitioner experienced darting eyes and distorted vision.  (Ex. 3-1, p. 65.)

Petitioner presented to NP Hendell on October 7, 2016 for "a fairly abrupt onset [of] subjective visual complaints and persistent low-grade headache."  (Ex. 2, p. 20.) NP Hendell wrote that petitioner's ophthalmologic, neurologic, and general exams were all normal, and that an EEG showed no abnormalities.  (*Id.*)  NP Hendell was "not exactly sure what all of her symptoms mean," and considered "some variation of migraine" as a possible cause of her symptoms but was "not convinced it is absolutely true at this point" that migraine was the source of her symptoms.  (*Id.*)  NP Hendell prescribed petitioner a low dose of amitriptyline as well as naproxen to be taken every twelve hours for five days.  (*Id.*)  NP Hendell also wondered whether anxiety could be causing her symptoms, and he instructed petitioner to return in two weeks.  (*Id.*)

On October 7, 2016, petitioner's MRI without contrast showed no acute intracranial process.  (Ex. 2, p. 37.)

On October 19, 2016, petitioner saw Lee Klombers, M.D. for a neuro-ophthalmologic examination.  (ECF No. 1, Ex. G, p. 7.)  Petitioner's examination revealed altitudinal visual field defects; her neuro-ophthalmologic exam was normal; and Dr. Klombers recommended an MRI and possibly a lumbar puncture.  (*Id.*)

On October 20, 2016, petitioner returned to see NP Hendell for "a history of transient visual alterations of unclear etiology."  (Ex. 2, p. 14.)  NP Hendell discontinued the amitriptyline since it had "been of no benefit."  (*Id.*)  NP Hendell felt "the jury [wa]s still out regarding her ultimate diagnosis" and did not think an MRI would show anything but acknowledged that he could not yet dispute "the potential for other inflammatory or infectious problems," so he proceeded with an MRI with contrast and also decided to "look into the logistics of obtaining a sedated lumbar puncture."  (*Id.*)  NP Hendell also renewed petitioner's school excuse for an additional two weeks to allow petitioner time to undergo the necessary medical studies.  (*Id.*)

Petitioner presented to the emergency department at PSHMC on November 7, 2016 for visual distortions for the past five weeks.  (Ex. 6-2, p. 16.)  Petitioner was discharged the same day with a diagnosis of "change in vision" and was asked to see a neurologist.  (*Id.* at 18-19.)

On November 9, 2016, petitioner saw pediatric neurologist Jena Khera, M.D. (Ex. 2, p. 5.)  Dr. Khera wrote that "the last time [petitioner] felt completely 'normal' was Sept 27, 2016, and she denies any head injury," but petitioner also recalls falling "on her tailbone while roller skating in July 2016" and hitting "her head on a tree branch" at the

5

end of summer 2016.  (*Id.* at 7.)  Petitioner complained of persistent visual symptoms,[8] headaches that were "not awful" and "really…not that big of a deal," "zoning out with eyes darting," difficulties concentrating, abdominal pain for two years, lightheadedness, nausea, and sleep difficulties.  (*Id.* at 7-8.)  Petitioner's MRI, lab tests, and neuro-ophthalmologic exam were all normal.  (*Id.* at 6.)  Dr. Khera thought that petitioner's "constellation of symptoms…[were] most consistent with post concussion syndrome" since one does not even have to have "an injury to the head [to] have a concussion," and Dr. Khera "recommended an evaluation by concussion rehabilitation."  (*Id.*)  Dr. Khera states that "[t]here is no other physiological explanation for her symptoms," partly because her symptoms "are not indicative of inflammation or infection of the central nervous system."  (*Id.*)

On November 15, 2016, petitioner had an initial evaluation for speech therapy.  (Ex. 8, pp. 40-41.)

Petitioner saw her pediatrician, Dr. Abels, again on November 21, 2016, who wrote, "I am interested in what the neurologist at Hershey will say, but we discussed that there is unlikely to be a definitive answer/cause found today[.]  Mom is concerned about the symptoms being caused by Flu vaccine, and I still think this is unlikely…." (Ex. 12, pp. 19-20.)

That same day, petitioner saw pediatric neurologist Debra Byler, M.D., at PSHMC.  (Ex. 6-2, p. 49.)  Dr. Byler wrote that petitioner's younger sister has had Alice in Wonderland Syndrome, cyclic vomiting, and psoriasis, and that petitioner's mother has had headaches.  (*Id.* at 50.)  Petitioner's systemic exam and neurological exam findings were normal.  (*Id.* at 50-51.)  Dr. Byler wrote that she could not find an explanation based on nervous system disease for petitioner's many symptoms, and that she could not "think of any additional studies that would be helpful."  (*Id.* at 51.)  Dr. Byler said petitioner's symptoms might be from a form of somatization disorder, or be psychologically based, and told petitioner that a neuropsychological evaluation "could be pursued if desired."  (*Id.*)

Petitioner presented to the emergency department on December 15, 2016 complaining of nausea, vision changes, and headaches after hitting her head on a wooden railing and was discharged in stable condition that same day.  (Ex. 3-1, pp. 16-17, 27.)  On December 29, 2016, petitioner returned to the emergency department due to weakness, intermittent dizziness, and nausea, and because her legs felt "shakey and weak."  (*Id.* at 120.)  Petitioner's neurological exam was normal, her head CT without contrast was "within normal limits," and she was discharged in stable condition.  (*Id.* at 121-122, 124.)

On January 4, 2017, petitioner had an unremarkable neurology evaluation conducted by pediatric neurologist Dana Cummings, M.D., at the Children's Hospital of Pittsburgh.  (Ex. 19-2, pp. 22, 24-25.)  Dr. Cummings wrote that petitioner:

---

[8] Dr. Khera wrote that petitioner's visual symptoms were "what bothers her the most."  (Ex. 2, p. 7.)

> is a 14-year-old with an unusual set of symptoms. Part of her sensory dysesthesia is accompanied by lightheadedness and dizziness and that could be in part due to some autonomic dysfunction, especially related to low iron. We will get iron studies and thyroid studies today. [9] There probably is an element of migraine as well. It is difficult to explain this so-called persistent visual distortion given the absence of objective data that I can find on examination. It sounds like she may have an overall disturbance of attention both visual as well as cognitive. Reportedly, she had 1-hour EEG that was normal. I did not have that data. So, differential diagnosis includes [some] kind of metabolic issue versus migraine variant. Much less likely would be some kind of occipital epilepsy. I am not really suspicious of an encephalopathy or any kind of demyelinating disease.
>
> Family is very focused on relationship to vaccine, but I do not really suspect a post-vaccine encephalopathy. The family was eager to get a lumbar puncture done at this time. I do not think that would be the next step. We can get a 23-hour EEG to look for any signs of encephalopathy, seizure tendencies.
>
> …I think it would be very important for her to see a child psychiatrist. She has been seeing a therapist and I think it will be very important as we continue the neurologic evaluation to pursue behavioral health evaluation in parallel.

(*Id.* at 25.)

After nine sessions of skilled speech therapy, petitioner requested to be discharged on January 31, 2017 because petitioner "[felt] better and no longer [needed] therapy." (Ex. 8, p. 23.)

On February 8, 2017, at CHOP's Diagnostic and Complex Care Center, petitioner saw Alyssa Siegel, M.D., who concluded that petitioner's "constellation of symptoms is consistent with POT syndrome." (Ex. 20-1, pp. 4, 7.) Dr. Siegel noted that petitioner met the criteria for POTS when she "showed a change in heart rate of 59 bpm from recumbent to standing." (*Id.* at 7.)

Petitioner went to York Hospital on March 6, 2018 for self-injury, i.e., "several days of cutting over the dorsal aspect of the right forearm." (Ex. 3-2, p. 67.) Petitioner cites many psychosocial stressors such as "trouble with friends, school work, increased demand on her time with a role in the school musical." (*Id.*) Petitioner also denied hallucinations, suicidal ideation, and homicidal ideation. (*Id.*) Counselor Megan Warner wrote:

---

[9] These studies showed normal findings. (Ex. 19-2, p. 7.)

7

> Mood is depressed. Affect is congruent. She is calm and cooperative during the crisis assessment. Sleep is decreased. Appetite is [within normal limits]. She denies drug/cigarette/alcohol use. She is not on any medications. She was seeing a therapist at Meadowlands but stopped going approximately 9 months ago because she felt like she wasn't really benefiting. Patient was seeing a therapist due to her medical condition. Patient is diagnosed with POTS. Patient still reports visual disturbances at times. She missed a majority of school last year and was home schooled. This year she took more honors classes and feels that the work is difficult. Mother believes that the patient is overwhelmed with the school work because she is a perfectionist and always has to get straight A's. Patient also picked up "an intense" part in the school play. Mother states that the patient is not very social because she states that she wants to stay away from the drama. Patient does have a boyfriend who is supportive. Her one close friend abruptly moved away and her other close friend since 3rd grade recently told her that she "needed space." Patient appears to be upset about this and becomes tearful when talking about this subject.

(*Id.* at 71.) Counselor Megan Warner diagnosed petitioner with anxiety. (*Id.*)

On March 8, 2018 through March 2, 2020, petitioner saw Rachel Bradley, LCSW, for adjustment disorder at Cognitive Health Solutions. (Ex. 21, pp. 3, 152.)

On May 31, 2018, Dr. Matthew Elias, M.D., at the CHOP Cardiac Center further evaluated petitioner for POTS, stating that:

> [Petitioner] has a normal cardiac examination and normal ECG with a prior normal cardiac evaluation locally. She has no evidence of heart disease as the cause of her symptoms. Certainly, if any of these symptoms, particularly shortness of breath, worsen, we can reevaluate that conclusion. Although she does not have any significant tachycardia upon standing today, based [on] the note from Dr. Siegel last year, I agree that she previously met the criteria for having POTS. I emphasized that it's important to know that POTS is not dangerous or life threatening and eventually resolves on its own, but our goal is to speed up that process.

(Ex. 20-1, p. 93.)

On July 19, 2018, petitioner saw neurologist Daniel Licht, MD, at CHOP for a second opinion. (Ex. 20-1, pp. 122, 128.) Dr. Licht wrote that petitioner "started 9th grade and appeared to adjust well," but at the "end of September [received] a flu [shot] and six days after shot started [complaining] of symptoms." (*Id.* at 122.) Dr. Licht also wrote that petitioner stated she had been having "tics for over a year," which worsened in April 2018 and progressed to include vocal tics. (*Id.*) Dr. Licht also noted that petitioner had a family history of "Alice in Wonderland Syndrome and cyclic vomiting" in one younger sister as well as "dizziness and mild POTS" in another younger sister. (*Id.*

at 125.)  Petitioner's comprehensive neurological exam was normal, and Dr. Licht assessed that petitioner had Tourette's disorder.  (*Id.* at 125, 126.)  A lumbar puncture for anti-NMDA and autoimmune encephalitis was negative.  (Ex. 20-3, p. 43.)

On September 20, 2018, petitioner followed up with neuro-ophthalmologist Dr. Liu at CHOP after last seeing Dr. Liu in 2011.  (Ex. 9, pp. 4, 6.)  Petitioner had a normal exam, and Dr. Liu assessed that petitioner did not meet the diagnostic criteria for pseudotumor cerebri syndrome, and he discouraged additional spinal taps.  (*Id.* at 5-6.)

On September 19, 2018, petitioner saw Arunjot Singh, M.D., at CHOP's Division of Gastroenterology, Hepatology and Nutrition for a history of chronic abdominal pain and nausea.  (Ex. 9, pp. 11-15.)  On October 29, 2018, petitioner's abdominal ultrasound and abdominal x-ray showed negative findings.  (Ex. 3-2, pp. 18, 23.)  On December 20, 2018, petitioner followed up with Dr. Singh who wrote that "[d]ue to the chronicity of symptoms and negative workup, this is most consistent with a functional disorder such as irritable bowel syndrome."  (Ex. 9, p. 7, 9.)

On October 31, 2018, petitioner's mother exchanged messages with Erin O'Connor Prange, CRNP, and wrote, "[m]y honest opinion is that the flu shot in 2016 caused some changes in [petitioner's] brain and body that are creating these symptoms and maybe that doesn't show on a[n] MRI or spinal tap.  That doesn't mean it isn't really happening or isn't real."  (Ex. 20-6, p. 49.)  NP O'Connor Prange wrote back that she did not intend for petitioner's mother to think petitioner's symptoms were not real, but also did not comment on petitioner's mother's opinion that the flu shot caused petitioner's symptoms.  (*Id.* at 48-49.)

On February 5, 2019, after petitioner presented to WellSpan Urgent Care complaining of neurological symptoms two days after a Tourette's episode, Monique S. Hall, M.D., diagnosed petitioner with chronic nonintractable headache, told petitioner she may take ibuprofen or Excedrin, and instructed petitioner to see a neurologist if her symptoms continue.  (Ex. 7, p. 24.)

On February 28, 2019, petitioner presented to Erin O'Connor Prange, CRNP, for her tics.  (Ex. 20-6, p. 136.)  NP O'Connor Prange wrote that petitioner "has not been able to [concentrate] on school work.  Cannot remember what she is studying.  Getting zeros on assignments" and that petitioner "has been missing multiple days of school and unable to keep up with work."  (*Id.*)  Similarly, on April 19, 2019, Sabrina A Gmuca, M.D., wrote that petitioner "missed about 50 days of school this year and is at jeopardy of not finishing this school year."  (Ex. 20-7, p. 101.)

On April 19, 2019, in response to a pain history form asking petitioner, "if events trigger pain please describe," petitioner reported that her pain "got way worse after flu shot in Sept. 2016."  (Ex. 20-7, p. 102.)

On May 7, 2019, Lisa Block, M.D., noted during a psychiatric evaluation that petitioner was "mildly fidgety but not over active and able to focus on directed questions.

She [did show] some evidence of tics of eye and the muscles of facial expression." (Ex. 5, pp. 6, 8.) Dr. Block also noted that petitioner's "eye contact was appropriate and her behavior was generally cooperative. Her speech was of normal rate and tone without any loosening of associations [sic]. Her answers to questions were clear and goal-directed. Her affect was generally appropriate to her stated mod of fine." (*Id.* at 8.) Dr. Block also noted that petitioner denied "any suicidal or homicidal ideation," that she was "alert and oriented," that she denied hallucinations, and that there was "no evidence of delusional thinking." (*Id.*) Dr. Bock also wrote that petitioner's insight was "felt to be fair to age-appropriate but her responses to questions about social judgement and the office were variable to poor." (*Id.*) Dr. Block assessed that petitioner suffers from anxiety and depression and that petitioner should continue with therapy. (*Id.* at 9.) Petitioner did not consent to taking any medications. (*Id.*)

### III.     Legal Standard

Petitioners who are denied compensation for their claims brought under the Vaccine Act may still be awarded attorneys' fees and costs "if the special master or court determines that the petition was brought in good faith and there was a reasonable basis for the claim for which the petition was brought." 42 U.S.C. § 300aa-15(e)(1); *Cloer v. Sec'y of Health & Human Servs.*, 675 F.3d 1358, 1360–61 (Fed. Cir. 2012). But even when a claim was brought in good faith and has a reasonable basis, a special master may still deny attorneys' fees. *See* 42 U.S.C. § 300aa-15(e)(1); *Cloer*, 675 F.3d at 1362.

"Good faith" and "reasonable basis" are two distinct requirements under the Vaccine Act. *Simmons v. Sec'y of Health & Human Servs.*, 875 F.3d 632, 635 (Fed. Cir. 2017). Good faith is a subjective inquiry while reasonable basis is an objective inquiry that does not factor subjective views into its consideration. *See James-Cornelius v. Sec'y of Health & Human Servs.*, 984 F.3d 1374, 1379 (Fed. Cir. 2021). In this case, petitioner's good faith is not challenged, leaving only the question of whether there was a reasonable basis for the filing of the petition.

The evidentiary standard for establishing a reasonable basis as prerequisite to an award of attorneys' fees and costs is lower than the evidentiary standard for being awarded compensation under the Vaccine Act. To establish a reasonable basis for attorneys' fees, the petitioner need not prove a likelihood of success. *See Woods v. Sec'y of Health & Human Servs.*, No. 10-377V, 2012 WL 4010485, at *6-*7 (Fed. Cl. 2012). Instead, the special master considers the totality of the circumstances and evaluates objective evidence that, while amounting to less than a preponderance of evidence, constitutes "more than a mere scintilla" of evidence. *Cottingham v. Sec'y of Health & Human Servs.*, 971 F.3d 1337, 1344, 1346 (Fed. Cir. 2020); *see also Amankwaa v. Sec'y of Health & Human Servs.*, 138 Fed. Cl. 282, 287 (Fed. Cl. 2018).

Examples of "more than a mere scintilla" of objective evidence supporting causation include medical records that provide "only circumstantial evidence of causation." *James-Cornelius*, 984 F.3d at 1379-80 (finding that record evidence lacking an express medical opinion on causation still showed circumstantial evidence of

causation where 1) petitioner's medicals records contained a doctor's note questioning whether a vaccine adverse event should be reported, 2) the medical course suggested a challenge-rechallenge event of petitioner's symptoms becoming worse after additional injections of the vaccine, 3) medical articles hypothesized that the vaccine can cause the symptoms at issue, and 4) petitioner suffered some of the same symptoms that were listed in the vaccine's package insert as potential adverse reactions of the vaccine)[10]; *Cottingham,* 971 F.3d at 1346 (finding that petitioner's medical records showed at minimum circumstantial evidence of causation where petitioner's medical records showed that petitioner received the Gardasil vaccine and subsequently experienced symptoms that were identified in the Gardasil package insert as potential adverse reactions of the vaccine).

Even though petitioner can meet the reasonable basis standard by pointing to circumstantial evidence in the medical records, a temporal relationship between the vaccine and the alleged symptoms by itself is not sufficient to establish a reasonable basis.  *Compare Bekiaris v. Sec'y of Health & Human Servs.*, 140 Fed. Cl. 108, 110, 114-15 (Fed. Cl. 2018) (finding no reasonable basis for an award for attorneys' fees and costs where petitioner only showed a temporal proximity between her third injection of the HPV vaccine and the onset of her symptoms, i.e., hives and skin irritation, without submitting an expert report providing evidence that the HPV vaccine was the cause of her injuries), *with A.S. by Svagdis v. Sec'y of Health & Human Servs.*, No. 15-520V, 2020 WL 3969874, at *2 (Fed. Cl. Spec. Mstr. June 4, 2020) (finding a reasonable basis for an award for attorneys' fees and costs where petitioners showed more than a temporal proximity between their daughter's vaccines and her symptoms by submitting four expert reports of physicians offering medical opinions and medical literature in support of potential causation).

## IV.     Party Contentions

Petitioner's initial motion did not contain a legal argument for why petitioner should be awarded attorneys' fees and costs.  (*See* ECF No. 49.)  Respondent responded by arguing that petitioner provided no objective evidence because petitioner 1) did not clearly allege that the vaccine caused a clear injury as there was no unifying diagnosis, 2) claimed that petitioner was in good health before her vaccination even though the record shows petitioner suffered from headaches, visual disturbances, and abdominal pain for several years prior to her vaccination, 3) provided no opinion from any physicians that the flu vaccine could have been a possible cause of her symptoms and conversely provided multiple physicians' opinions that expressly doubted any causal relationship, and 4) provided no expert report to support her claim.  (ECF No. 50, pp. 13-14.)

---

[10] Nothing in *James-Cornelius* suggests the full extent of what may constitute circumstantial evidence, but the four examples of circumstantial evidence in *James-Cornelius* provide some guidance regarding the types of circumstantial evidence that may be considered in determining whether a reasonable basis was established.  Conversely, the Federal Circuit also stressed in *James-Cornelius* that an award of attorneys' fees and costs is within the special master's discretion and remanded the case for further proceedings. 984 F.3d at 1381.  Accordingly, it is also not the case that the presence of these specific elements of circumstantial evidence necessarily compel a finding that reasonable basis exists.

Petitioner replied by arguing that petitioner established a reasonable basis because petitioner's doctors did not specifically rule out the flu vaccine as a cause of her alleged injury and instead commented that they were unsure whether the flu vaccine was the cause. (ECF No. 51, p. 12.) Petitioner further argued that the flu vaccine was the cause because there was no other identified cause for petitioner's symptoms. (*Id.* at 13.)

Petitioner argued that she established a reasonable basis by showing substantial objective evidence that relates to the factual basis of petitioner's claim, per *Simmons*.[11] (ECF No. 51, p. 15.) Petitioner argues that the objective evidence provided is 1) "the utter failure of any of the medical specialists to unequivocally conclude some other causation for [petitioner's] injuries," 2) the fact that the flu vaccine was the only intervening event that occurred prior to the sudden onset of her symptoms, 3) the fact that none of petitioner's doctors ruled out the vaccine causing petitioner's symptoms "to a degree of medical certainty," and 4) the fact that many of petitioner's doctors referenced how suddenly petitioner's symptoms arose. (*Id.*)

## V.    Discussion

In focusing on the confidence (or purported lack thereof) with which the treating physicians ruled-out vaccine causation, petitioner effectively concedes there is no direct evidence of vaccine causation in this case. As explained above, however, the required showing of "more than a mere scintilla" of objective evidence can be satisfied even when medical records provide "only circumstantial evidence of causation." *James-Cornelius*, 984 F.3d at 1379-80; *Cottingham,* 971 F.3d at 1346. Nonetheless, in this case, neither the medical records nor the record as a whole contain even the lesser "more than a mere scintilla" of evidence of causation required to establish a reasonable basis. Examination of the Federal Circuit's decision in *James-Cornelius* illustrates why.

In *James-Cornelius*, the Federal Circuit found that petitioner's medical records showed circumstantial evidence of causation because the medical records 1) contained a doctor's note ("??VAERS") suggestive of a belief that the vaccine caused petitioner's symptoms, 2) suggested a challenge-rechallenge event of petitioner's symptoms becoming worse after additional injections of the vaccine, 3) contained medical articles hypothesizing that the vaccine can cause petitioner's symptoms, and 4) showed that petitioner suffered some of the same symptoms listed in the vaccine's package insert as potential adverse reactions of the vaccine. *See James-Cornelius*, 984 F.3d at 1377, 1379-80. Here, however, the record does not include any similar evidence. Petitioner suffered pre-existing symptoms, her doctors opined against a causal relationship to her vaccination, and there is nothing in her filings (medical records or otherwise) that

---

[11] *Simmons*, 875 F.3d at 633-36 (holding that a reasonable basis requires an objective inquiry relating to the factual basis of petitioner's claim).

provides any sort of medical theory or logical sequence of cause and effect supporting vaccine causation.

The only consideration that might serve as circumstantial evidence of causation is the *reported* temporal relationship between petitioner's vaccination and her symptoms becoming worse after her flu vaccine. However, a temporal aspect alone is not enough to suggest causation. *Accord Hibbard v. Sec'y of Health & Human Servs.*, 698 F.3d 1355, 1365-66 (Fed. Cir. 2012) (finding that an award of compensation is not appropriate where petitioner only shows a temporal association between vaccination and injury (*Althen* prong three)). In fact, prior cases have explicitly held that a temporal relationship alone does not confer a reasonable basis for the filing of a petition. *See Bekiaris*, 140 Fed. Cl. at 114-15; *see also A.S. by Svagdis*, 2020 WL 3969874 at *2. Moreover, because petitioner had a long history of abdominal pain, visual disturbances, and headaches prior to vaccination, and because her physicians never arrived at a unifying diagnosis, the temporal relationship suggested by petitioner is not self-evidently reasonable or reliable without further medical opinion. In fact, the medical records here also contain two express medical opinions from treating physicians (a pediatrician and a pediatric neurologist) discounting the purported significance of the temporal relationship.

More specifically, the medical records in this case contain two categories of medical treater notes relating to the vaccine, neither of which is sufficient to meet petitioner's burden. First, many of the medical records contain medical specialists' notes commenting only on the temporal aspect of the flu vaccine and petitioner's symptoms with no comment about causation. Second, two physicians explicitly rejected the possibility that the vaccine caused petitioner's symptoms.

The first category of medical specialists' notes (e.g., "end of September [received] a flu [shot] and six days after shot started [complaining] of symptoms") is different from the "??VAERS" note in *James-Cornelius*. (Ex. 20-1, p. 122); *James-Cornelius*, 984 F.3d at 1380. Writing "??VAERS," even as a question, can be interpreted as suggesting that the doctor was concerned enough that a vaccine-caused adverse event occurred to contemplate officially reporting petitioner's condition as such an adverse event.[12] *James-Cornelius,* 984 F.3d at 1377-80. In this case, however, many physicians merely documented that petitioner reported a history to them that included the fact of a prior vaccination occurring during a potentially relevant period. These physicians did not reveal any thinking as to causation.

Additionally, two of petitioner's physicians in this case explicitly rejected the opinion that petitioner's flu vaccine caused her symptoms. Lori Abels, D.O., wrote that "[m]om is concerned about the symptoms being caused by Flu vaccine, and I still think this is unlikely….," and similarly, pediatric neurologist Dana Cummings, M.D., wrote that petitioner's "[f]amily is very focused on relationship to vaccine, but I do not really

---

[12] VAERS (i.e., the Vaccine Adverse Event Reporting System) exists for the public to report adverse events related to vaccines. *See About VAERS: Background and Public Health Importance*, VAERS (Oct. 22, 2021, 3:32 PM), https://vaers.hhs.gov/about.html.

suspect a post-vaccine encephalopathy." (Ex. 12, pp. 20, 22; Ex. 19-2, p. 25.) This second category of medical treater notes, rejecting the vaccine as causing petitioner's symptoms, also distinguishes this case from *James-Cornelius.* Explicitly opining that the vaccine was unlikely to have caused petitioner's symptoms is obviously contrary to any implied opinion that petitioner suffered an adverse event related to the vaccine. Indeed, the medical records in *James-Cornelius* did not contain *any* express medical opinion on causation, which led the court to consider the circumstantial evidence (e.g., the "??VAERS" note) in the first place. *James-Cornelius*, 984 F.3d at 1380. But here, petitioner's medical records do contain express medical opinions on causation that weigh *against* petitioner's claim.

      The present case is also different from *James-Cornelius* because in *James-Cornelius*, petitioner's showing also included factual information potentially fitting petitioner's allegation of a rechallenge event[13] and medical articles hypothesizing a causal relationship between petitioner's vaccine and petitioner's symptoms, both of which also served as circumstantial evidence to further support a possible causal relationship in the context of that case. Here, that additional evidence is absent. Moreover, as explained above, in the context of this medical history, the reported association between petitioner's vaccination and symptoms is not self-evidently medically reasonable without any supporting medical opinion. *James-Cornelius*, 984 F.3d at 1380 (explaining that "lay opinions as to causation or medical diagnosis may be properly characterized as mere 'subjective belief' when the witness is not competent to testify on those subjects . . ."). Nothing in the record of this case suggests a medical theory or logical sequence of cause and effect to support vaccine causation.

      Additionally, the fact that the petitioner in *James-Cornelius* experienced some of the same symptoms (i.e., "headache and syncope") that were listed in the vaccine's package insert as potential adverse reactions also served as circumstantial evidence. *James-Cornelius*, 984 F.3d at 1377. The package insert was also a factor in *Cottingham* where petitioner's medical records showed that petitioner received the Gardasil vaccine and subsequently experienced the same four symptoms (i.e., "dizziness, headaches, vomiting, and syncope") that were identified in the Gardasil package insert. *Cottingham*, 971 F.3d at 1346. But here, there was no package insert listing petitioner's symptoms as potential adverse reactions of the flu vaccine. Moreover, in this case, even if a package insert was filed, evidence that petitioner suffered *nonspecific* symptoms would not be evidence supporting causation because petitioner had symptoms prior to vaccination, had no unifying diagnosis, and her treating physicians explicitly rejected vaccine causation.

---

[13] The Federal Circuit noted that "rechallenge" has been "recognized as a form of causation evidence." *James-Cornelius*, 984 F.3d at 1380 (citing *Capizzano v. Sec'y of Health & Human Servs.*, 440 F.3d 1317, 1322 (Fed. Cir. 2006).) In *Capizzano*, the Federal Circuit explained that "[a] rechallenge event occurs when a patient who had an adverse reaction to a vaccine suffers worsened symptoms after an additional injection of the vaccine. The chief special master stated that this evidence of rechallenge constituted 'such strong proof of causality that it is unnecessary to determine the mechanism of cause—it is understood to be occurring.'" *Capizzano*, 440 F.3d at 1322. When supported factually, a rechallenge event is therefore unique in presenting a circumstance that does not necessarily need supporting medical opinion to explain the cause-and-effect relationship.

Petitioner's remaining argument that the failure to identify an alternative cause should in itself stand as evidence supporting a reasonable basis is especially unpersuasive where again, as here, treating physicians explicitly rejected a causal relationship to vaccination. Nonetheless, I note in the interest of completeness that on November 9, 2016, another of petitioner's physicians, pediatric neurologist Jena Khera, M.D., stated that "[t]here is no other physiological explanation for her symptoms," partly because her symptoms "are not indicative of inflammation or infection of the central nervous system." (Ex. 2, p. 6.) Importantly, however, this statement was made in support of Dr. Khera's assessment of a probable concussion and not as a means of indicating the condition was wholly unexplained. Moreover, the fact that petitioner had no central nervous system inflammation could potentially be viewed as exculpatory of at least some vaccine reactions. In any event, neither Dr. Khera's record nor the absence of an alternative explanation, provides any reasoning actually supportive of petitioner's claim of vaccine causation.

In sum, even though medical records with only circumstantial evidence of causation have established a reasonable basis for purposes of an award of attorneys' fees, the medical records in this case do not contain circumstantial evidence of causation comparable to what was present in those cases. Here, the record shows no suggestion of any belief of causation by treating physicians, no evidence of a causally relevant phenomenon such as challenge-rechallenge, no medical articles hypothesizing causation, and no package insert listing petitioner's symptoms as potential adverse reactions of the vaccine. Moreover, those two explicit physician opinions that are available cast doubt on the alleged causal relationship between vaccination and injury. And, even if an expert opinion could theoretically have helped overcome any of this lack of evidence, no such opinion was filed.

### VI. Conclusion

For the reasons set forth above, petitioner did not establish a reasonable basis for the filing of her petition as required for an award for attorneys' fees and costs. Accordingly, an award for attorneys' fees and costs is denied.[14]

**IT IS SO ORDERED.**

<u>s/Daniel T. Horner</u><br>
Daniel T. Horner<br>
Special Master

---

[14] In the absence of a timely-filed motion for review of this Decision, the Clerk of the Court shall enter judgment accordingly.